CRAWFORD FITTING COMPANY, Plaintiff,

v.

UNITED STATES of America, Defendant.

No. C82–3008.

United States District Court, N.D. Ohio, E.D.

Jan. 16, 1985.

Ernest P. Mansour, David B. Cathcart, Mansour, Gavin, Gerlack & Manos Co., L.P.A., Cleveland, Ohio, for plaintiff.

Jason P. Green, Trial Atty., Tax Div., Dept. of Justice, Washington, D.C., Thomas Bauer, Asst. U.S. Atty., Akron, Ohio, for defendant.

## MEMORANDUM OPINION

DOWD, District Judge.

This is an income tax refund suit brought by the taxpayer and plaintiff, Crawford Fitting Company, arising from the disallowance of an expense deduction to plaintiff of $20,485.00 for an "insurance premium" paid to a captive insurance company, the Constance Insurance Company. The disallowance of the deduction resulted in an income tax deficiency of $9,423.00 owed by the plaintiff to the defendant. Plaintiff contends that its payment of the insurance premium was deductible as an ordinary and necessary business expense under § 162(a) of the 1954 Internal Revenue Code. Defendant, however, argues that the taxpayer may not deduct the payment as an insurance premium where the risk of loss has not been shifted from or distributed beyond the plaintiff's economic family to an unrelated insurer. Accordingly, defendant argues that the payment made by the plaintiff to the Constance Insurance Company was a contribution of capital to Constance, and therefore, not a deductible premium.

### I. PROCEDURAL HISTORY

Plaintiff paid the deficiency assessed against it, filed a timely refund claim, and then timely filed the instant action. Plaintiff sets forth one count in its complaint, in which it states that the government's disallowance of a business deduction in the amount of $20,485.00 for an insurance premium, resulting in the assessment of $9,243.00, plus interest and penalties, against it, and collection of the same, was erroneous and illegal. Plaintiff argues that it has overpaid its liabilities for income taxes for the year of 1978, and is therefore entitled to recover from the defendant the sum of $9,243.00, plus penalties and interest. The matter is now before the Court on a stipulation of facts by the parties, as follows:

### II. FINDINGS OF FACT

By agreement of parties, a stipulation of facts was entered into the record as follows. [All references to exhibits submitted by the parties are omitted.]

1. Crawford Fitting Company (hereinafter referred to as "Crawford"), along with Nupro Company, Whitey Company and Cajon Company (hereinafter referred to as "manufacturing companies"), manufacture valves and fittings which are used in numerous applications. Among other applications, these valves and fittings are used in nuclear power plants, petrochemical plants, offshore oil rigs, scientific research and the space program.

2. There are seperately [sic] incorporated companies (hereinafter referred to as "support companies") that provide parts and/or services to the manufacturing companies.

3. Eastern Swagelok, Western Swagelok and Central Swagelok (hereinafter referred to as "regional warehouses") are separately incorporated regional warehouses which purchase products from the manufacturing companies. They are owned as follows:

| | | |
|---|---|---|
| A. Eastern— | Fred A. Lennon | 60% |
| | Catherine Lennon Lozick | 40% |
| B. Western— | Fred A. Lennon | 50% |
| | Alice P. Lennon | 50% |
| C. Southern— | Fred A. Lennon | 54.5% |
| | Catherine Lennon Lozick | 45.5% |
| D. Central— | Fred A. Lennon | 55.6% |
| | Catherine Lennon Lozick | 44.4% |

4. The regional warehouses, support and manufacturing companies are referred to hereinafter as the Crawford Companies.

5. The regional warehouses resell the products to a number of independently owned and operated Crawford distributors, The domestic distributors are exclusive dealers of Crawford.

6. Mr. Fred A. Lennon is the sole owner of Crawford. Mr. Lennon also has interests in various other corporations that provide parts and/or services to the manufacturing companies as set forth in Exhibit I. Alice P. Lennon is the wife of Mr. Lennon, Catherine Lozick is his daughter and John P. Lennon is his son.

7. The Crawford Companies had the need for a large amount of product and general liability insurance, which, by the year in issue, became very expensive.

8. Prior to establishing its own insurance company, the quotes the Crawford Companies received for insurance was generally an up front cash premium of $850,-000.00 to obtain the first one million dollars of coverage. Constance was created because the Crawford Companies were unable to secure insurance at a reasonable price and without substantial limitations on the types and amounts of risk.

9. Constance Insurance Company (hereinafter referred to as "Constance") was chartered in March of 1978.

10. Constance was created under, and is governed by, the Colorado Captive Insurance [Company] Act C.R.S. § 10-6-101-130 (1973).

11. Constance has its headquarters in Denver, Colorado.

12. Constance is owned in the following manner:

| Entity | Percentage of Ownership |
| --- | --- |
| Eastern Swagelok | 20% |
| Western Swagelok | 20% |
| Southern Swagelok | 20% |
| Central Swagelok | 20% |
| John Fant (A) | 5% |
| F.J. Callahan (B) | 5% |
| Ernest P. Mansour (C) | 5% |
| Norge Tobbe (D) | 5% |
| | 100% |

N.J. Tobbe (D) is an assistant secretary of Crawford Fitting, John Fant (A) is an attorney employed by Crawford Fitting Co., F.J. Callahan (B) is the Executive Vice President of Crawford Fitting company, Ernest P. Mansour (C) is a partner in the law firm Mansour, Gavin, Gerlack & Manos Co., L.P.A. Mansour, Gavin, Gerlack & Manos has performed legal services for Crawford Fitting for a number of years.

13. The initial capitalization of Constance was a million dollars which was provided by the shareholders in proportion to their ownership interest.

14. Since the initial capitalization of Constance, there have been no additional capital contributions or sale of stock.

15. Since the initial capitalization of Constance, the only funds which it has obtained have been from insurance premiums paid by the Crawford Companies and Constance's investment income.

16. The Crawford Companies do not directly or indirectly indemnify Constance.

17. Constance was administered in 1978 by an independent group of insurance consultants and actuaries known as Alexander & Alexander who negotiated and drafted the policy on behalf of Constance.

18. Constance, for the period covered by 4-1-78 through 12-31-78, issued Policy # CGL-001, for comprehensive general liability and product liability insurance for the parties listed in Endorsement # 25, Pages 1 and 2. The named insured under the policy included Fred. A. Lennon, A.P. Lennon, J.P. Lennon, C.L. Lozick, Edward A. Lozick, approximately 45 Crawford Companies, the Profit Sharing and/or Pension Trusts and/or Plans of the Crawford Companies.

19. The 115 independent distributors, none of which are owned directly or indirectly by Crawford, are insured under the products liability coverage.

20. Nertz, Inc., is a named insured owned 100% by Ed Lozick. Ed Lozick is married to Catherine Lozick.

21. Ekohwerks Company is a named insured owned by Bernie Gallagher, William Tobbe, E.J. Callahan, Earl Shuffleberg and Steve Matousek.

22. Midwest Bank and Trust Company is the trustee of the Profit Sharing and/or Pension Trusts. Among other investments, the Trusts own and lease real property and screw machines.

23. The policy was drafted by Alexander & Alexander. The terms of the policy were negotiated by Alexander & Alexander on behalf of Constance.

24. All management fees for Alexander & Alexander were paid by Constance.

25. The policy provided coverage in the amount of $1,500,000. Constance retained $100,000 of the risk per occurrence, 100,000 aggregate, and reinsured the balance of $1,400,000 with an unrelated insurance company, The Bermuda Fire & Marine Insurance Co., Limited. Constance paid a premium of $475,000 for the reinsurance. The total premium for the policy for the period April 1, 1978 to April 1, 1979 was $575,000.

26. Risk retention and reinsurance was decided by the Constance Board of Directors based upon Alexander & Alexander's recommendations from its own actuarial experience. The Board of Directors of Constance determined how much of the risk would be retained and how much would be reinsured. This decision was based upon a recommendation of Alexander & Alexander based on their actuarial experience in the field.

27. The amount of the premium charged by Constance was suggested by Alexander & Alexander based on their actuarial information. In addition, the board considered premiums being charged in the industry.

28. Crawford paid $157,028 in premiums to Constance in 1978. The total premium for the policy for the period April 1, 1978 to April 1, 1979 was $575,000. Each company paid its premium to Constance with its own check. In the year ending December 31, 1978, Constance Insurance Company lost $60,490.

29. The United States of America allocated, based upon a method of proration $20,485 to the retained portion of Constance's risk. This resulted in the disallowance to Crawford of an expense deduction in the amount of $20,485 for the period in question.

30. Constance, under the terms of the policy with Crawford, must provide coverage during the policy period for claims made at any time for products manufactured by the Crawford Co. and it is required to defend claims and pay the legal expenses related to them.

31. For risk to be reinsured there has to be a primary insurance policy.

32. Constance paid all liabilities incurred by Crawford within the scope of the policy without any direct or indirect reimbursement from Crawford.

33. The period in issue for Crawford is April, 1978 through December, 1978. Crawford was on a calendar year basis. Constance commenced business on April 1, 1978. Constance is on a fiscal year commencing April 1.

34. The disallowance resulted in an income tax deficiency of $9,423.00 to Crawford Fitting Co. There was no tax consequence to Constance as a result of this adjustment in its fiscal 1978 tax year.

35. The disallowed deduction was based upon the $100,000 of insurance that Constance retained.

36. Crawford paid the deficiency, filed a timely refund claim and then timely filed this suit for refund for $9,423.00 of corporate income tax plus interest thereon as is provided by law.

37. The portion of the premium that Crawford paid Constance that was reinsured to third parties was allowed as a deductible expense.

38. Crawford also had excess general and product liability insurance with unrelated third parties over and above that which it arranged through Constance, for at least 30 million dollars during the period in issue.

39. The excess insurance was purchased by Crawford in the open market. The excess insurance coverage is applicable only after the coverage provided by Constance is exhausted.

## III. ANALYSIS

The Court has jurisdiction of the parties and subject matter under 28 U.S.C. § 1346(a)(1).

a. *Background: Deductibility of Insurance Premiums.*

Title 26 of the Internal Revenue Code, § 162(a), allows a deduction for "all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business." Section 1.162–1(a) of the Income Tax Regulations provides, in relevant part, that:

> Business expenses deductible from gross income include the ordinary and necessary expenditures directly connected with or pertaining to the taxpayer's trade or business.... Among the items included in business expenses are ... insurance premiums against fire, storm, theft, accident, or other similar losses in the case of a business....

"Insurance" is not defined under the Internal Revenue Code. The Supreme Court, however, has stated that elements of risk-shifting and risk-distributing, historically and commonly, have been considered ordinary indicia of insurance. *Helvering v. LeGierse,* 312 U.S. 531, 61 S.Ct. 646, 85 L.Ed. 996 (1941).[1]

■ Where elements of risk-shifting and risk-distributing are absent from an insurance contract, the fundamental aspects of an insurance agreement are lacking. *See Steere Tank Lines, Inc. v. U.S.,* 577 F.2d 279 (5th Cir.1978), *cert. denied,* 440 U.S. 946, 99 S.Ct. 1424, 59 L.Ed.2d 634 (1979). In that case, the Court stated that "a taxpayer who establishes a reserve in an effort to ensure against future losses is not entitled to a deduction at the time the reserve is established or funded. A deduction is proper when the liability becomes fixed." *Id.* at 282. Accordingly, the Court found that where there was no shifting or genuine pooling of risks under the insurance agreement before it, plaintiff's payment of money into a contract premium account, from which were to be paid all accident claims against the taxpayer, was not an insurance premium deductible as a business expense, but rather a nondeductible reserve for accident claims. *See also Spring Canyon Coal Co. v. Commissioner,* 43 F.2d 78 (10th Cir.1930), *cert. denied,* 284 U.S. 654, 52 S.Ct. 33, 76 L.Ed. 555 (1931) (Corporation's payments into self-insurance reserve fund held not deductible as an "ordinary and necessary business expense"). A taxpayer cannot "deduct as an expense an amount which he fears he may some day be called upon to spend," such as self-insurance. *See id.* at 80, citing *Appeal of Pan-American Hide Co.,* 1 B.T.A. 1249 (1925).

The fundamental issue in the case at bar, then, is whether the payment made by the plaintiff Crawford Fitting Company to the Constance Insurance Company, characterized by the plaintiff as an insurance premium, was in fact an insurance premium deductible under § 162, or was, as the defendant contends, a reserve held by the plaintiff Crawford Fitting Company as self-insurance to cover contingent losses.[2]

---

**1.** A well-stated definition of these two concepts was adopted by the Second Circuit Court of Appeals in *Commissioner v. Treganowan,* 183 F.2d 288 (2nd Cir.1950), *cert. denied,* 340 U.S. 853, 71 S.Ct. 82, 95 L.Ed. 625. Although the type of insurance under consideration was life insurance, we find the definition to be helpful nonetheless.

> Risk shifting emphasizes the individual aspect of insurance: the effecting of a contract between the insurer and insured each of whom gamble on the time the latter will die. Risk distribution, on the other hand, emphasizes the broader, social aspect of insurance as a method of dispelling the danger of a potential loss by spreading its cost throughout a group. By diffusing the risks through a mass of separate risk-shifting contracts, the insurer casts his lot with the law of averages.

> *Id.* at 291.

**2.** The Tenth Circuit Court of Appeals has set forth the difference between insurance and self-insurance in a nutshell: "Insurance exists when a contractual relationship between the insurer and the insured shifts to the insurer the risk of loss of the insured. Self-insurance is the assumption of risk of his own loss by one having an insurable interest (footnote omitted)." *U.S. v. Newton Livestock Auction Market, Inc.,* 336 F.2d 673, 676 (10th Cir.1964).

B. *Positions of the Parties.*

Defendant asserts that risk-shifting is an essential element of an insurance contract, citing *U.S. v. Newton Livestock Auction Market, Inc., supra,* and states that the risk has not been shifted as to the $100,-000.00 risk retained and insured by Constance itself. Defendant contends that accordingly, the portion of plaintiff's payment of an insurance premium to Constance for the $100,000.00 risk coverage is a reserve for self-insurance, and therefore not deductible as an insurance premium. Furthermore, defendant asserts that its characterization of the premium plaintiff paid to Constance is not changed by the undisputed fact that Constance is a separate corporate entity from plaintiff, where the risk of loss remains within Crawford's economic group. Defendant states, "[m]erely because Constance is a separate corporate entity does not mean taxpayer can label a transaction as 'insurance' where no risk as to the first $100,000 of loss has been shifted."

Plaintiff Crawford argues first that the insurance premium in issue is deductible as an ordinary and necessary business expenses under I.R.C. § 162, where the premium was paid to Constance in an arms-length transaction, and second, that Constance is not "related" to Crawford. Plaintiff states that the "economic family theory" advanced by the government violates "the firmly entrenched separate corporate entity doctrine which recognizes, for both tax and nontax purposes, bona fide transactions between related corporations." Plaintiff argues that "Constance is not a sham, nor is it merely the alter-ego of Crawford." Plaintiff states:

> [Constance] is a separate corporate entity engaged in the insurance business. The shareholders of Constance are not the shareholders of Crawford. The premiums charged by Constance were actuarially sound and consistent with the insurance industry; Constance performed all of the usual and ordinary procedures engaged in by other insurance companies

including underwriting, claims handling and adjustment, and investment of reserves. Constance provided Crawford with a legitimate means of obtaining insurance coverage for Crawford and numerous "affiliated" companies—insurance that was either unavailable or only available at much higher rates. Thus, the present case is fundamentally different from those cases in which a nominal corporation has been disregarded as a true separate entity because it is merely a sham or lacks all business justification. *See e.g., Noonan v. Commissioner,* 52 T.C. 907 (1969) [sic]; *Roubik v. Commissioner,* 53 T.C. 365 (1969).

Plaintiff further states that while it is "questionable whether risk-shifting or risk-distributing are the criterion for determining the tax deductibility of insurance premiums," nonetheless, "both elements were present in this case."

It is undisputed that to the extent Constance reinsured the remainder of the risk, in the amount of $1,400,000.00, with the Bermuda Fire & Marine Insurance Co., Ltd., an unrelated insurance company, plaintiff is entitled to a deduction for the insurance premium for that amount of coverage.[3] This reinsurance arrangement neutralized the risk borne by Constance to the extent of that amount. The focus, then, is upon the $100,000.00 not reinsured with the Bermuda Fire & Marine Insurance Co., but retained by Constance, and the question is whether or not plaintiff shifted and distributed the risk of loss up to that amount to its subsidiary, Constance, and whether, in law, it was required to do so in order to deduct the premium therefor.

C. *Law and Discussion.*

In *Carnation Co. v. Commissioner,* 640 F.2d 1010 (9th Cir.1981), *cert. denied,* 454 U.S. 965, 102 S.Ct. 506, 70 L.Ed.2d 381, the Carnation Company incorporated a wholly owned Bermuda subsidiary to insure and reinsure various multiple line risks of the Carnation Company and its subsidiaries.

**3.** Constance paid a premium of $475,000 for the reinsurance.

The Bermuda subsidiary, Three Flowers Assurance Co., Ltd., was initially capitalized with a contribution of $120,000.00 from Carnation. Subsequently, Carnation proceeded to purchase a blanket insurance policy from an independent insurance company, American Home, which then, under contract, reinsured 90% of its liability under the Carnation policy with Carnation's wholly owned Bermuda insurance subsidiary, Three Flowers. Under the terms of the reinsurance contract, American Home was required to first pay Carnation's claims before it could seek reimbursement from Three Flowers. However, because of American Home's concern about Three Flowers' ability to cover the reinsured losses, Carnation agreed, prior to the consummation of the reinsurance contract, to capitalize Three Flowers up to three million dollars (i.e. an additional $2,880,000.00) at Carnation's election or Three Flowers' request. American Home then ceded 90% of the premiums it received from Carnation to Three Flowers, and Three Flowers paid American Home a five percent commission, as well as reimbursement for premium losses.

Reciting the Tax Court's findings that the agreements between Carnation, American Home, and Three Flowers, were interdependent, the Court stated, "The key was that American Home refused to enter into the reinsurance contract with Three Flowers unless Carnation agreed to capitalize Three Flowers." The Court stated that the three agreements must be considered together, and that, *in toto*, they revealed that Carnation was attempting to shift its risk of loss. The Court then upheld the tax court's holding that, as a matter of law, the agreements between the three parties neutralized Carnation's risk of loss to the extent that American Home reinsured with Three Flowers. Summarily rejecting Carnation's contention that the revenue ruling conflicted with the separate status given corporations, the Court held that the payment received by the wholly owned foreign subsidiary was the parent company's contribution of capital and not an insurance premium.

In reaching its decision, the Court relied on the reasoning set out in Rev.Rul. 77–316, 1977–2 C.B. 53. In that ruling, the government reviewed three situations in which a domestic parent corporation and its domestic subsidiaries paid amounts as insurance premiums to (1) a wholly owned foreign "insurance" subsidiary, (2) an unrelated domestic insurance subsidiary, which immediately transferred 95% of the risks to a wholly owned foreign "insurance" subsidiary, and (3) a wholly owned foreign "insurance" subsidiary which contemporaneously transferred 90% of the risks to an unrelated insurance company, for purposes of insuring the parent company. In all three situations, the government ruled that where the taxpayer's wholly owned subsidiary retained risks of the parent company, the premiums attributable to those risks were not deductible.

After reciting the different fact situations, the government stated that both risk-shifting and risk-distributing are necessary elements of an insurance agreement. The government then noted that in each of the three recited situations, there was "no economic shifting or distributing of risks of loss with respect to the risks carried or retained by the wholly owned foreign subsidiaries." Rather, said the government, the insuring parent corporation, its domestic subsidiaries, and its wholly owned foreign "insurance" subsidiary, though in fact separate corporate entities, in reality "represent one economic family with the result that those who bear the ultimate economic burden of loss are the same persons who suffer the loss." Accordingly, the government stated that there was no deduction under I.R.C. § 162 for amounts paid by the parent companies and their domestic subsidiaries as insurance premiums for risks ultimately retained by the foreign insurance companies. The government stated: "Because such amounts remain within the economic family and under the practical control of the respective parent in each situation, there has been no amount 'paid or incurred'." Furthermore, said the government, such amounts would not con-

stitute taxable income to the foreign subsidiaries under I.R.C. § 61, but rather contributions of capital under I.R.C. § 118, since nothing was occurring other than the movement of an asset, cash, within the families of related corporations.

However, said the government, to the extent that amounts paid by the parent companies as insurance premiums are for risks retained by an unrelated insurer and are not reinsured by a subsidiary of the parent, or are transferred through a reinsurance agreement to an unrelated insurer, the premiums paid to cover these risks are deductible under § 162 of the Code. "Since these amounts are not withdrawable by ... [the parent company] and its domestic subsidiaries ..., they have been 'paid or incurred' within the meaning of § 162. Furthermore, the requisite shifting and distribution of the risks has occurred to the extent the unrelated insurers ... bear the risks of loss."

In its ruling, the government did not dispute the identity of the wholly owned foreign subsidiaries of the parent companies as corporate entities independent of the parent companies, citing *Moline Properties v. Commissioner*, 319 U.S. 436, 63 S.Ct. 1132, 87 L.Ed. 1499 (1943), 1943 C.B. 1011, but examined what it called "the economic reality of each situation." A look at such economic realities, stated the government, was what led the government to conclude that the various "insurance agreement[s]," to the extent that risks were retained by the wholly owned foreign subsidiaries, were "designed to obtain a deduction by indirect means that would be denied if sought directly."

The rationale of both *Carnation Co.* and Rev.Rul. 77-316 was applied by the U.S. District Court for the District of Colorado in *Stearns-Roger Corp. v. U.S.*, 577 F.Supp. 833 (D.Colo.1984), 84-1 T.C. 83,217, ¶ 9165. In that case, *Stearns-Roger* incorporated a captive insurance company pursuant to the Colorado Captive Insurance Company Act, Colo.Rev.Stat. § 10-6-101-130 (1973), which issued insurance policies covering *Stearns-Roger*, its fifteen subsidiaries, and its project customers. The captive insurance company, Glendale Insurance Company, was capitalized with one million dollars. *Stearns-Roger* agreed to indemnify Glendale for losses and damages up to three million dollars.

*Stearns-Roger* deducted the premiums it paid to Glendale as business expenses for insurance for the 1974–1978 tax years. Said deductions were disallowed by the Internal Revenue Service. *Stearns-Roger* then paid the deficiencies and filed the refund action. The initial inquiry, stated the Court, in determining the "deductibility" of the sums Stearns-Roger paid Glendale as "insurance premiums" was "whether Glendale, a wholly owned *Stearns-Roger* subsidiary, should be treated as a corporate entity distinct from the plaintiff (footnote omitted)." *Id.* at 836, 84-1 T.C. at 83,219. Recognizing that a legitimate corporate entity will not be disregarded for tax purposes where it is created for a business purpose, or where business activity follows its creation, and the fact that a parent corporation and its wholly owned subsidiaries may in fact be separate tax entities, the Court stated that there are, however, certain situations where "the financial transactions of separate but related corporations may be aggregated and treated as the transactions of a single taxpayer for certain purposes." *Id.* at 836, 84-1 T.C. at 83,219–83,220. In such cases, stated the Court, where corporations engage in transactions with the principal purpose of avoiding or evading the payment of income tax, certain tax laws permit the Internal Revenue Service to void the transactions. *See, e.g.,* 26 U.S.C. §§ 267, 269, 482. However, stated the Court, while tax considerations played some part in the insurance arrangement under review, it found that the principal impelling motive for *Stearns-Roger's* formation and transaction of business with Glendale was "business necessity," and not tax avoidance or evasion. The Court therefore found and concluded that the attribution sections cited above were inapplicable.

The Court next considered the economic family theory, and the concepts of risk-

shifting and risk-distributing, set forth in *Carnation* Rev.Rul. 77–316, *supra,* and stated that:

> Glendale Insurance Company is not in the business of insuring "others." Its only business is to insure its parent corporation which wholly owns it and ultimately bears any loss or enjoys any profits it produces. Both profits and losses stay within the *Stearns-Roger* "economic family." In substances the arrangement shifts no more risk from *Stearns-Roger* than if it had self insured.

*Stearns-Roger* at 838, 84–1 T.C. at 83,221.

The Court thus concluded that the agreement between *Stearns-Roger* and Glendale was not an insurance contract for purposes of federal income taxation since the agreement did not shift the risk of losses from *Stearns-Roger* to its wholly owned subsidiary. Accordingly, the Court held that plaintiff was not entitled to a business expense deduction for "insurance premiums" paid to the Glendale Insurance Company.

Likewise, in *Beech Aircraft Corp. v. U.S.,* Civ. No. 82–1369 (D.Kan. July 3, 1984), the plaintiff corporation formed a subsidiary captive insurance company, a Bermuda insurance company named Travel Air Insurance Company, Ltd., "to obtain products liability insurance and provide, by attorneys of its selection, defenses of such actions superior to that provided by commercial insurance carriers." *Id.* at 85,401. In *Beech,* the Court concluded that there was no real transfer of risks under the agreement between Beech and the Bermuda insurance company as to excess coverage for the latter part of 1972, and disallowed a business expense deduction for "insurance premiums" made by Beech to Travel Air for such coverage.

When the Bermuda insurance company was formed, it issued 120,000 shares of common stock at $1.00 per share. Beech acquired 109,000 shares, and the other 11,000 shares were issued to six others, who were, for the most part affiliated with Beech. The Bermuda insurance company then issued a two million dollar policy covering products liability to Beech. Beech paid a premium of one and a half million dollars for coverage for the period of September 1, 1971 through August 31, 1972. Beech simultaneously obtained excess coverage from Fairfax Underwriters in the amount of ten million dollars, and then an additional three million dollars coverage from Travel Air for the same period. Total coverage amounted to 15 million dollars.

In 1973, Beech sought to obtain primary coverage from several different insurance carriers under its own conditions, but was unsuccessful. However, Beech was able to obtain 13 million dollars of excess coverage from two separate companies, in addition to the two million dollars of primary coverage from Travel Air, as well as five million dollars of top excess insurance coverage under a contract with three other companies. This established a total coverage of 20 million dollars.[4] Beech Aircraft paid Travel Air $1,675,000.00 for the primary coverage, an amount which Travel Air calculated would, when invested for the time it would hold the money, equal the amount of money it might have to pay for losses under the insurance contract with Beech.

When Beech filed its corporate income tax return for the fiscal year ending September 30, 1973, it claimed a business expense deduction for insurance "premiums" it paid to Travel Air for products liability insurance, which was disallowed. Beech paid the deficiency, and brought the action to recover the same.

In setting forth its conclusions of law, the Court noted that Travel Air was only capitalized for $150,000.00, while it purported to provide excess coverage for losses of several million dollars. "Only Beech could have responded to such a loss had such occurred," the Court stated. *Id.* at 85,404. Thus, stated the Court:

> Travel Air, nor did it agree to further enlarge the capital structure of Travel Air in any event." *Id.* at 85,401.

---

4. We note the Court's statement that "[t]here is no evidence that Beech made any guarantees that it would pay any losses which occurred greater than the excess insurance carried by

As a matter of economic reality, if and when a loss occurred and was paid by Travel Air, the net worth of Beech was reduced to approximately the same extent as though Beech had paid the loss itself. While these arrangements had the appearance of insurance, in reality Beech still carried the risk (citation omitted).

*Id.* Accordingly, the Court found that the transactions between Beech and Travel Air did not, in reality, constitute insurance, and therefore found that Beech was not entitled to deduct as a legitimate business expense the payments that it made to Travel Air as insurance premiums.

The Court finds the above cited cases, as well as Rev.Rul. 77–316, to be instructive in the Court's review of the matter *sub judice.* However, we find that the application of certain key concepts and definitions set forth in both to result in conclusions in the instant case different from those reached in the earlier cited cases and revenue ruling. The economic reality of the above cited cases and those situations reviewed in Rev.Rul. 77–316 was that a parent company was trying to deduct nondeductible costs of self-insurance by paying "insurance premiums" for risks that were retained. In this case, the insurance arrangement was legitimately organized to enable Crawford to secure insurance at a reasonable price, without substantial limitations on the types and amounts of risks, *see* Stipulation No. 8, in return for the payment of legitimate premiums. Furthermore, the Court finds that the arrangement survives the application of the economic family theory and the concepts of risk-shifting and risk-distributing as they are discussed in the above cited cases and Rev.Rul. 77–316

█ In determining whether or not plaintiff correctly took a deduction for the insurance premiums in question, we focus on substance over form in order to determine whether or not "in truth and substance the sums set aside by [plaintiff] were not 'expenses' of the business." *Spring Canyon Coal Co. v. Commissioner, supra,* at 79, citing *Eisner v. Macomber,* 252 U.S. 189,

40 S.Ct. 189, 64 L.Ed. 521 (1920) and *Bowers v. Kerbaugh-Empire Co.,* 271 U.S. 170, 46 S.Ct. 449, 70 L.Ed. 886 (1926). This Court certainly does not countenance the kind of arrangement between corporations set up for the purpose of avoiding or evading income tax, nor suggest that in those situations the financial transactions of the separately incorporated but related corporations should not be aggregated and treated as the transactions of a single taxpayer. However, in the instant case, the Court finds that the taxpayer and the other shareholders of the captive insurance company, as well as the insureds, are not so economically related that their separate financial transactions must be aggregated and treated as the transactions of a single taxpayer, the plaintiff. The Court further finds that the economic risk of loss of the plaintiff was shifted and distributed among the shareholders of the captive insurance company and its insureds.

First, looking at the nature of the ownership of the plaintiff and the captive insurance company, the Court finds it is somewhat different in the case at bar than in the cases aforementioned. In this case, plaintiff Crawford Fitting Company is a separately incorporated entity from the wholly owned captive insurance company, and is *not* the parent company of the captive. Crawford Fitting Company, along with Nupro Company, Whitey Company and Cajon Company, referred to as the Crawford Companies, manufacture and sell their products to four separately incorporated regional warehouses. These warehouses, which purchase and resell the products of the manufacturing companies to a number of independently owned and operated Crawford distributors, are also independently incorporated from the plaintiff and the captive insurance company. They are owned, in varying percentages, by Fred A. Lennon, his wife, Alice P. Lennon, and his daughter, Catherine Lennon Lozick. Eighty percent of Constance's stock is owned by the four incorporated warehouses. The remaining 20% of Constance's stock is owned by Norge Tobe, assistant

secretary of Crawford Fitting, John Fant, in-house counsel, F.J. Callahan, executive vice-president, and Ernest P. Mansour, "outside counsel." The Court finds these above related alterations of fact to be so significantly different from the situations set forth in the above cited cases and in Rev.Rul. 77–316 that they change the characterization of the "insurance premiums," and the tax treatment accorded them, in those cases and that ruling.

We find the instant case to be more closely aligned with Rev.Rul. 78–338, 1978–2 C.B. 110, than the above cited cases and Rev.Rul. 77–316. In Rev.Rul. 78–338, the government reviewed an insurance arrangement between the taxpayer, a domestic corporation, and a foreign insurance company formed by the taxpayer and owned by the taxpayer and 30 other wholly unrelated owner-insureds. No shareholder owned a controlling interest in the insurance company, and pursuant to the insurance company's bylaws, no shareholder's individual risk coverage could exceed five percent of the total risks the company insured. The insurance company provided insurance coverage only for its shareholders, their subsidiaries, and their affiliates, for certain specified risks located throughout the world. Premiums were established in accordance with customary insurance ratings.

Stating that since, under the circumstances of the situation before it, i.e., an absence of any economic relationship between the taxpayer and other insureds-shareholders, the government found that the economic risk of loss could be shifted and distributed among the shareholders-insureds, and that the arrangement was thus not one of self-insurance. Accordingly, it held that the insurance premiums were deductible under I.R.C. § 162, as ordinary and necessary business expenses, distinguishing Rev.Rul. 77–316.

While in Rev.Rul. 78–338 the taxpayer owned a certain percentage of common voting stock in the captive insurance company, so did thirty other unrelated corporations as well. In the instant case, the plaintiff owns *no* ownership share in the captive insurance company. Defendants hasten to point out that the plaintiff taxpayer is in fact owned by Fred A. Lennon, who owns 100% of the plaintiff Crawford Fitting Company and varying percentages of the regional warehouses, which own 80% of Constance. However, we note that Crawford Fitting Company, as earlier pointed out, was not the parent company of the warehouses, nor was it the parent company of the captive insurance company. The fact that Fred A. Lennon owns Crawford and a percentage of the warehouses does not mean that the warehouses' 80% ownership interest in Constance is the same as an 80% ownership by Crawford. Any gain or loss enjoyed or suffered by Constance does not affect the net worth of Crawford. The Court thus finds Fred A. Lennon's ownership interest in the different companies inconsequential where each in fact was incorporated for a valid business purpose independent from the others, and the creation of each was followed by legitimate business activity. *See Stearns-Roger Corp., Inc., supra* at 836, 84–1 T.C. at 83,219.

Furthermore, the ownership structure of Constance was diversified by the participation and ownership of shareholders other than the regional warehouses. While the government argues that the 20% ownership of the captive by Tobe, Fant, Callahan, and Mansour, was ownership by shareholders so closely connected with Crawford and its owner as to constitute ownership by the same, or at least by members of the same economic family, the Court finds that some kind of employment relationship with the plaintiff, an insured of the captive company, but not an owner, to be insignificant. None of those four men will, by virtue of their employment relationship with Crawford or the owner thereof, feel the benefit of the deduction for insurance premiums taken by Crawford in insuring with the captive. Furthermore, any interest they have in Crawford will not suffer a loss by virtue of any loss of the captive.

The Court also takes notice of the fact that beyond the distinguishing presence of

nonaffiliated shareholders in the case at bar is the presence of nonaffiliated policyholders. The named insureds under the policy included not only Fred A. Lennon and Crawford, but the other manufacturing companies, the numerous companies that supply goods and services to the manufacturing companies, the 115 independent distributors of the Crawford products, the profit sharing trusts administered by Midwest Bank and Trust Company, as well as A.P. Lennon, J.P. Lennon, C.L. Lozick, and Edward L. Lozick. None of these have any ownership interest in the captive insurance company, or, for that matter, in the plaintiff taxpayer. Each of the covered companies paid a premium proportionate to its insurance coverage, an amount totaling, by the Court's calculations, slightly more than 70% of all premiums received by Constance, although the amount of premiums relating to the potential liability of the independent distributors was incorporated in the premium paid by Crawford. *See* deposition of Ernest P. Mansour, pp. 17, 34, appended to Stipulation of Facts as Exhibit K. These various persons and entities covered under the policy existed independent of the plaintiff, and the risks they faced were sufficiently similar and independent of those faced by the plaintiff so as to make the sum of risks carried by the captive company less than the sum of risks of the insureds. The Court notes as an aside that the parties themselves stipulated that the 115 independent distributors are not owned either directly or indirectly by Crawford.

Additionally, and not inconsequentially, the Court notes that the initial capitalization of Constance, provided by the shareholders in proportion to their ownership interest, totaled one million dollars. *See* Stipulation No. 13. In the instant case, there was no question, as there was in certain of the above recited factual situations, that the captive was inadequately capitalized to cover all risks it covered under the policy with the parent without an infusion of capital from the parent. In this case, the capitalization of Constance was more than adequate to cover the risks it retained under the policy. Specifically, Constance was capitalized to one million dollars. Of the $1,500,000.00 of coverage under the policy, Constance retained $100,-000.00 of the risk per occurrence, $100,-000.00 aggregate, so that it would not have to extend itself beyond the capitalization risk of the policy. The balance of $1,400,-000.00 was reinsured on an aggregate basis with an unrelated insurance company.[5] Furthermore, there was no agreement between Crawford, the plaintiff, and the captive requiring the plaintiff to indemnify it for a sum of money above that amount initially paid by the plaintiff in capitalizing the captive, nor has such indemnification occurred. There have been no additional capital contributions since the initial capitalization.

In conclusion, the Court finds that the plaintiff did not form the captive insurance company for purposes of tax avoidance or evasion, but rather for a legitimate business purpose; that the captive insurance company is a separate and independent corporate entity which provided insurance for the plaintiff that was unavailable or available only at higher rates; that the premiums charged by the plaintiff were actuarially based, and proportionate to the risks they covered; that plaintiff taxpayer is not a shareholder of the captive, nor a shareholder in any of the warehouses which have an ownership interest in Constance, and that a percentage of ownership in the captive by four men who have an employment relationship with the plaintiff taxpayer did not constitute ownership by Crawford or members of its "economic family"; and that various nonaffiliated persons or entities facing risks similar but independent of those faced by plaintiff were named insureds under the policy, enabling the distribution of risk thereunder.

---

5. At oral arguments, counsel for plaintiff represented that plaintiff has a third layer of additional coverage, which "goes up to $200 million." *See* Tr. 15. The Court notes Stipulation No. 38, that Crawford had excess general and product liability insurance of at least 30 million dollars.

The Court thus holds that the plaintiff did shift the risk of loss outside its economic family to the captive, who fairly and adequately distributed the risk of loss among its group of insureds, and that the financial transactions of the separate corporations should therefore not be aggregated and treated as the transactions of a single taxpayer. The amount paid by the taxpayer to the captive insurance company as an insurance premium is thus deductible as an ordinary and necessary business expense under § 162 of the Internal Revenue Code, and plaintiff is accordingly entitled to a refund in the amount of $9,423.00, plus interest thereon as provided by law.

IT IS SO ORDERED.