HUMANA INC. AND SUBSIDIARIES, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Humana, Inc. v. Commissioner
Docket Nos. 15292-80, 17130-82.[1]
United States Tax Court
T.C. Memo 1985-426; 1985 Tax Ct. Memo LEXIS 207; 50 T.C.M. (CCH) 784; T.C.M. (RIA) 85426; August 14, 1985. James E. Milliman,Charles J. Lavelle,Arthur Hipwell, for the petitioners. Joel V. Williamson,Scott R. Cox, for the respondent. KORNER
MEMORANDUM FINDINGS OF FACT AND OPINION KORNER, Judge: Respondent determined deficiencies against petitioners, Humana Inc. and subsidiaries, as follows: Docket No.
Tax year ended
Deficiency
15292-80
8/31/76
$4,615,905
8/31/77
9,409,814
17130-82
8/31/78
7,723,542
8/31/79
20,460,078
After concessions, the sole issue for decision is whether petitioners are entitled to deduct, as an ordinary and necessary business expense, amounts paid to Humana Inc.'s captive insurance company and deducted as premiums for general liability and medical malpractice insurance. *208 FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulations of facts and exhibits attached thereto are incorporated herein by this reference. Humana Inc. is a Delaware corporation organized and incorporated on July 27, 1964. At all times here pertinent, Humana Inc.'s stock was publicly traded on the New York Stock Exchange, and the company's principal place of business was in Louisville, Kentucky. Humana Inc. was the common parent of an affiliated group that filed Federal income tax returns on a consolidated basis for the taxable years ending August 31, 1976 through August 31, 1979, inclusive, with the Internal Revenue Service Center at Memphis, Tennessee (hereinafter referred to, collectively, as "petitioners"). American Medicorp, Inc. (hereinafter "AMI") was incorporated on January 11, 1968, and was primarily in the business of operating general, acute care community hospitals offering a wide range of medical, surgical and related services. On February 2, 1978, Humana Inc. acquired 53.4 percent of the common stock of AMI in exchange for $85,500,000 and 2,849,567 shares of its preferred stock. On September 27, 1978, Humana Subsidiary, Inc. *209 , a wholly-owned subsidiary of Humana Inc., which was formed for such purpose, was merged with and into AMI. As a result of the merger, Humana Inc. became the owner of all of the outstanding common stock of AMI. AMI's final short period taxable year ended on September 27, 1978. It was merged into Humana Inc. on December 21, 1978, and AMI became part of Humana Inc.'s consolidated group during its taxable year ended August 31, 1979. As of February of 1978, AMI had two general liability insurance policies. The primary policy was provided by American Home Assurance Co. (hereinafter "American Home"), and an excess layer of insurance was provided by an industry pooling arrangement known as Hospital Underwriting Group (hereinafter "HUG"). As of November of 1976, Humana Inc. operated 62 hospitals in 16 states and one foreign country containing 8,586 beds. As of 1979, principally as a result of its acquisition of AMI, Humana Inc. operated 92 hospitals in 23 states and one foreign country containing 16,529 beds. Humana Inc., together with all of its subsidiaries and affiliates currently operate, inter alia, 87 hospitals owned by 36 corporations. From 1972 until August 31, 1976, Continental *210 Insurance Company (hereinafter "Continental") provided Humana Inc. with general liability insurance, including malpractice liability and workers' compensation insurance. From as early as 1973, however, there were signs that the availability of such coverage to hospitals was diminishing, and by the mid-1970's, this problem had become severe for reasons explained by respondent's expert witness, Richard Stewart, as follows: The main difference between liability insurance, particularly the more exotic kinds, like products liability, or medical malpractice, is this very long interval between setting your premium rate and collecting your money, and ultimatly [sic] knowing what your costs are, ultimately settling the claims. In the meantime, through accural [sic] accounting, what you think your ultimate losses are going to be is carried as a loss reserve. Again, small errors in the loss reserve have terrible effects on capital and on earnings. And all over the insurance business, through a combination of changing rules, general economic inflation, and misjudgments, companies were taking these terrible hits to their earnings as they tried to correct their loss reserved and liability *211 insurance in several lines, one of which was medical malpractice. A number of companies -- I would say a vast majority of companies -- concluded that they simply did not have any confidence in their numbers; that the swings were too wide. By letter dated May 7, 1976, Continental advised Humana Inc. that it would be unable to renew its insurance coverage when it expired on August 31, 1976. Through the services of its insurance broker, Marsh & McLennan, Inc. (hereinafter "MMI"), Humana Inc. attempted to obtain general and professional liability insurance from third-party insurers, but was unsuccessful. By letter dated June 1, 1976, directed to Humana Inc.'s then vice president for insurance, John V. Kessler, MMI recommended that Humana Inc. immediately take steps to establish a captive insurance company. At the time MMI's letter was received, Kessler and Humana Inc. were already considering the following options for dealing with what they regarded as the urgent situation engendered by Continental's withdrawal: (1) going uninsured; (2) creating a trust fund or reserve for self-insurance; (3) combining with other hospital companies in a five-year insurance pooling arrangement; *212 and (4) establishing a captive insurance company. Humana Inc. rejected the first option because it did not feel that it was strong enough to sustain the burden of catastrophic risk if it went uninsured. Humana Inc. rejected the second option because, first, it felt that it would not allow it access to commercial insurance markets for certain excess protection which it regarded as essential, second, some 40 percent of its business was under Medicare and Medicaid, and at least the former would not permit reserves to be treated as a cost for reimbursement, [2] and third, it was clear that payments into such a reserve fund would not be deductible for Federal tax purposes. Humana Inc. rejected the third option because, first, it had doubts about the financial viability of its potential affiliates in such a pooling arrangement, second, one such potential affiliate owned hospitals in what were regarded as the worst states for malpractice claims, and third, it was reluctant to bind itself to such an arrangement for a five-year period. The fourth option was considered *213 most attractive because it was felt that it possessed none of the perceived disadvantages associated with the other options, and it would provide a regulated method of insuring risks which would both isolate funds for the settlement of claims, and satisfy interested lenders, mortgagees and securities analysts. In addition, Humana Inc. believed that by choosing the captive subsidiary option, it would obtain access to world reinsurance and excess insurance markets. On July 14, 1976, Humana Inc. sought the approval of the Insurance Department of Colorado to establish a captive insurance company under Colorado law to insure its exposure to general and professional liabilities, including casualty, fire and medical malpractice. On August 5, 1976, Health Care Indemnity, Inc. (hereinafter "HCI") was incorporated under the Colorado Corporation Act. The articles of incorporation of HCI state the following purposes for its formation: [3]
to conduct, engage in and carry on the business of making all kinds of insurance and reinsurance authorized to be made under the Colorado Captive Insurance Company Act * * * and to conduct, engage in and carry on all other activities incident to conducting *214 such insurance and reinsurance business. Humana Holdings, N.V. (hereinafter "HHNV") is a Netherlands Antilles corporation organized and incorporated on August 4, 1976. Humana Inc. initially purchased all of the capital stock of HHNV for $250,000, and has since owned all of its issued and outstanding capital stock. The only business purpose for HHNV was to assist in the capitalization of HCI. Humana Inc. used HHNV for this purpose because it believed that to do otherwise would have required the consolidation of HCI and Humana Inc. for tax purposes, requiring Humana Inc. to abandon its fiscal year in favor of a calendar year for such purposes. At the time of HCI's initial capitalization, 400,000 shares of stock were issued. Of these, HHNV purchased 250,000 shares of preferred stock for $250,000 in cash, and Humana Inc. purchased 150,000 shares of common stock for $750,000, paid in irrevocable letters of credit issued in favor of the Commissioner of Insurance of the State of Colorado. At all times since such capitalization, each common share *215 of HCI has been entitled to five votes, and each preferred share to one vote. There were no agreements between HCI and Humana Inc. or its subsidiaries which would require the latter to contribute additional capital to HCI for the payment of any losses by that company. However, on May 31, 1979, Humana Inc. contributed $1,323,000 to the capital of HCI. Such sum represented a refund paid by HUG to Humana Inc. after AMI merged with Humana Inc. From August 20, 1976 to October 1i, 1982, HCI qualified as a captive insurance company under Colorado law. HCI issued the following policies during the years in issue, identifying Humana Inc. and affiliated and subsidiary corporations, in the numbers shown, as named insureds: Policy No.
Policy period
Coverage
From
To
No. of
No. of
corporations
hospitals
1001
9/1/76
8/31/77
22
64
1003
9/1/77 [4]
9/1/78
22
59
HCI-90178
9/1/78
9/1/79
48
97
(To correlate with their inception dates, the foregoing policies are hereinafter referred to by the respective numbers 090176, 090177 and 090178.) By policy number HCI-60178, effective from 6/1/78, at which time Humana Inc. owned 53.4 percent *216 of AMI's common stock, until 6/1/79 (hereinafter referred to by the number 060178), HCI additionally replaced AMI's primary policy with American Home, and incorporated by reference the terms of AMI's excess coverage under its policy with HUG. The charges for the foregoing policies accured ratably throughout the policy periods. During the years in issue, the following amounts were paid to HCI relative to such policies on behalf of petitioners, which deducted such amounts on their consolidated Federal income tax returns: Taxable year ended
Policy
Payments
8/31/77
090176
[5] $5,703,571
8/31/78
090177
[6] 5,865,986
8/31/79
090178
[7] 7,582,893
060178
[8] 1,903,125
Total:
$21,055,575
The foregoing charges were developed by MMI pursuant to standard industry practice by generally applying to the average number of occupied beds a composite rate developed by a rating organization known as Insurance Service Offices (hereinafter "ISO"), yielding a single sum for all covered facilities. The *217 resulting amounts were billed by HCI to Humana Inc. on a monthly basis, and were then paid by Humana Inc. Later, by means of an unexplained method of internal allocation, the foregoing amounts were charged back by the parent to its appropriate subsidiaries. *218 Each of the foregoing policies provided three types of coverage, viz, personal injury ("Coverage A"), property damage ("Coverage B") and professional liability, including personal injury relating to certain professional services (i.e., malpractice) ("Coverage C"). Each Humana Inc. policy also included a "good samaritan endorsement" under which professional employees, acting outside of their capacity as employees, were covered for certain occasional professional services not rendered for their personal benefit. Under each of the four policies, the following, inter alia, were considered as "an insured:" a. The named insured; b. Any officer, hospital administrator * * *, stockholder, or member of the Board of * * * Directors or Governors of the named insured while acting for * * * the named insured. [sic] c. Under Coverages A and B, any employee, student or volunteer worker of the names insured while acting within the scope of his duties * * *; * * * f. Under Coverage C, any person included in any of the employee classifications for which coverage is afforded under this policy, as indicated in Item 5 of the Declarations, while such person is acting within the scope *219 of his duties as an employee * * *. Pursuant to "Item 5 of the Declarations," any employee of the insured was covered, including those professional employees who were licensed residents, interns, physicians, surgeons or dentists, except that physicians, surgeons and dentists were excluded under policy number 060178. Under such policy, however, coverage was extended to independent contractors licensed as physicians and practicing in the hospital emergency room or attending to emergencies on the hospital premises. After June 1, 1979, this coverage was also provided for those insured under policy number 090178. Generally, no coverage was provided for non-employee physicians since they carried their own insurance. At all times here pertinent, phyments for coverage of each of the afore-described categories of insureds were paid by petitioners, and were not charged to the employee or other individual involved. Pursuant to policies numbered 090176, 090177 and 090178, HCI's liability was limited to $2,000,000 per occurrence under Coverages A, B and C, $2,000,000 in the aggregate under Coverages A and B, and $10,000,000 in the aggregate under Coverage C. [9] Pursuant to policy number *220 060178, HCI's liability was limited to $500,000 per occurrence and $2,400,000 in the aggregate for each category of covered risks. Humana Inc.'s insurance coverage during the years in issue also included multiple layers of excess coverage placed with third-pary insurance carriers, over and above the foregoing primary layer provided by HCI. By Policy numbers 1002 and 1004, HCI also provided certain excess comprehensive general coverage to Humana Inc. for the respective periods 9/1/76 to 8/31/77, and 9/1/77 to 8/31/78. All of the liability under these policies was reinsured by HCI to third-party reinsurance companies. With the exception of those policies, during the years in issue HCI neither reinsured the risks of losses with other insurance companies nor obtained policies with third-party insurers which were reinsured by or with HCI. Respondent allowed Humana Inc. a deduction for payment of the premiums for these policies. At all times here pertinent, HCI filed its own Federal income tax returns, and was not able to file and did not file on a consolidated *221 basis with its parent, Humana Inc. Such returns and HCI's books and records were prepared using the accrual method on a calendar year basis. During the years in issue, HCI had no employees other than its officers, most of whom were also officers of Humana Inc. By contract dated August of 1976, MMI provided HCI with resident managing officers and a variety of administrative and management services, including consulting, underwriting, risk control, recordkeeping and accounting services. At all times here pertinent, Underwriters Adjusting Co. contracted to provide claims administration and claims service for HCI. By notices dated May 14, 1980 and April 15, 1982, respondent determined the afore-described deficiencies relative to petitioners' respective tax years 1976 and 1977, and 1978 and 1979. After concessions, [10] the sole issue remaining for decision [11] is whether the following amounts deducted by petitioners as insurance expenses for their tax years ending August 31, 1977, August 31, 1978, and August 31, 1979, are allowable as ordinary and necessary business expenses under section 162: [12]
Tax year
Insurance expense
ending
disallowed
8/31/77
$5,703,571
8/31/78
5,865,986
8/31/79
9,486,018
Total:
$21,055,575
*222 OPINION This Court first confronted the issue of the deductibility of purported insurance premiums paid to a wholly-owned captive insurer in Carnation Co. v. Commissioner,71 T.C. 400 (1978), affd. 640 F.2d 1010 (9th Cir. 1981), cert. denied 454 U.S. 965 (1981). In that case, the taxpayer incorporated a wholly-owned captive in Bermuda ("Three Flowers") to insure and reinsure various multiple line *223 risks, including its own and those of its subsidiaries. On the same day, the taxpayer purchased a blanket insurance policy from an unrelated insurer, and its captive contracted to reinsure 90 percent of the insurer's liability under such policy. Prior to consummation of the reinsurance contract, in response to the concerns of the unrelated insurer about Three Flowers' ability to cover losses, Carnation agreed to capitalize Three Flowers, on demand of either of them, up to $3,000,000. Basing our holding on Helvering v. Le Gierse,312 U.S. 531 (1941), we decided that the taxpayer was not entitled to deduct as insurance premiums the 90 percent portion of its payments to the unrelated insurer which it had ceded to the captive insurer, as follows: By entering into the agreements in issue, Carnation attempted to shift its risk of property loss due to fire, lightning, vandalism, malicious mischief, sprinkler leakage, flood, and earthquake shock. The agreements attempted ultimately to shift 90 percent of the risk to Three Flowers and 10 percent of the risk to American Home [the unrelated insurer]. In the event of a covered casualty, the loss suffered by Carnation ultimately *224 would be borne 90 percent by Three Flowers and 10 percent by American Home. The agreement to purchase additional shares of Three Flowers by Carnation bound Carnation to an investment risk that was directly tied to the loss payment fortunes of Three Flowers, which in turn were wholly contingent upon the amount of property loss suffered by Carnation. The agreement by Three Flowers to "reinsure" Carnation's risks and the agreement by Carnation to capitalize Three Flowers up to $3 million on demand counteracted each other. Taken together, these two agreements are void of insurance risk. As was stated by the Court in Le Gierse, "in this combination the one neutralizes the risk customarily inherent in the other." 312 U.S. at 541. [71 T.C. at 409] Two U.S. District courts have followed the rationale of Carnation to reach the same result, Stearns-Roger Corp., Inc. v. United States,577 F. Supp. 833 (D. Colo. 1984), and Beech Aircraft Corp. v. United States, 84-2 USTC par. 9803, 54 AFTR 2d 84-6173 (D. Kan. 1984). One U.S. District Court applied the rationale of Carnation, but reached a contrary result on factual *225 distinctions. Crawford Fitting Company v. United States,606 F. Supp. 136 (N.D. Ohio 1985). [13]
Recently, the full Court with seven Judges dissenting decided another captive insurance case, Clougherty Packing Company v. Commissioner,84 T.C. 948 (1985). [14] In Clougherty, the taxpayer's wholly-owned subsidiary incorporated a wholly-owned captive insurer ("Lombardy"). As in the instant case, Lombardy was organized under Colorado law and was fully capitalized for $1,000,000, in accordance with the requirements of the Colorado insurance commissioner. Unlike Carnation, there was no agreement to inject additional capital into Lombardy. The taxpayer negotiated coverage for its workers' compensation insurance liabilities with an unrelated insurer ("Fremont"), *226 and agreed to have Lombardy reinsure the first $100,000 of any risk with Fremont ceding 92 percent of its premiums from the taxpayer to Lombardy for such coverage. On these facts, we decided in Clougherty that to the extent of the 92 percent portion of its premiums which were ceded to its captive insurer, the taxpyer had failed to shift its risk of loss, making such payments nondeductible as ordinary and necessary business expenses for insurance under section 162. In so holding, we reaffirmed and relied upon Carnation, noting that Carnation's agreement to capitalize Three Flowers was "only one of the several factors" upon which we therein relied, and that "The financial viability of the captive insurance subsidiary is not controlling." We believe that the instant case is controlled by the prior decisions of this Court in Carnation and Clougherty. In accordance with those decisions, it is *227 clear that because Humana Inc., either directly or through its wholly-owned foreign subsidiary, owns all of HCI, it has not shifted the risk of losses covered by the subject policies. Since risk has not been shifted, insurance does not exist and the payments in issue are not insurance premiums. [15]
We are not persuaded by petitioners' efforts to distinguish the instant case on the basis that the agreements in issue covered the risks not only of Humana Inc. but also of its subsidiaries. In Carnation, this Court found *228 that Three Flowers was formed to insure and reinsure the risks of the taxpayer anditssubsidiaries, and that the taxpayer had purchased and then reinsured a "blanket insurance policy." 71 T.C. at 402. In affirming, the Ninth Circuit also found that Three Flowers was formed to insure and reinsure risks of the taxpayer and its subsidiaries, and that "Three Flowers wrote insurance only for Carnation anditssubsidiaries." 640 F.2d at 1012. [Emphasis added.] Furthermore, the Ninth Circuit cited with approval situation 2 in Rev. Rul. 77-316, 1977-2 C.B. 53, wherein respondent concluded that there was neither risk shifting nor risk distribution to the extent that the insured's wholly-owned captive reinsured 95 percent of the casualty insurance risks of itself and its subsidiaries.640 F.2d at 1013. See also Stearns-Roger Corp., Inc. v. United States,supra.In light of Carnation, therefore, the fact that HCI insured not only Humana Inc. but also its subsidiaries does not help petitioners. Petitioners next make several alternative arguments that they should be entitled to deduct at *229 least a portion of the amounts in issue even if we uphold respondent's position that these payments failed to constitute deductible premiums to insure the risks of Humana Inc. and its subsidiaries. First, petitioners contend that a portion of the amounts are deductible as an expense of providing insurance on behalf of certain employees, officers, directors and contractors covered under the policies in issue. As to this first alternative argument, [16] petitioners cite no authority to support their apparent contention that their risks, whether arising from purely corporate acts or acts of specific corporate employees, were other than fully retained within the meaning of Carnation and Clougherty. Indeed, we believe that it would be difficult to find any such persuasive authority where, as here, the coverage of certain employees, officers and others was clearly an integral part of the protection of Humana Inc. and its subsidiaries. In this regard, on its form 10-K's filed with the Securities and Exchange Commission for the years in issue, which were stipulated into evidence, Humana Inc. described the coverage provided by HCI as follows: "The Insurance Subsidiary will insure *230 the risks of the Company only, and it will only provide insurance to physicians who are actually employed by the Company." [Emphasis added.] In such documents, "Company" is defined as Humana Inc. and its subsidiaries. Furthermore petitioners' witnesses John v. Kessler and Frank P. Doheny, Jr. and respondent's witness Richard Stewart were all in accord that the subject coverage was provided because, as stated by Stewart, "if hospital B offers protection and hospital A doesn't, then hospital A is probably out of business because it doesn't have any staff." Stewart further testified that "when you're defining a hospital, you just have to define these people in it. You can't have a basketball game with an empty floor. And so * * * Humana * * * was insuring * * * its whole core operation." Second, petitioners contend that even if the subject payments failed to constitute deductible insurance premiums, they are nonetheless deductible under section 162 "because they are 'ordinary and necessary' business expenses *231 'paid or incurred' during the taxable years." As to this argument, it is sufficient to note that petitioners have failed to demonstrate that such payments, if not for insurance, were otherwise paid or incurred for a qualifying business purpose under section 162(a). [17]
Finally, petitioners resurrect an array of arguments which were raised by the taxpayer and disposed of by this Court in Carnation. In light of our recent examination and reaffirmation of Carnation in Clougherty, we see no reason to revisit such issues herein. To reflect the foregoing, Decisions will be entered under Rule 155.
Footnotes
1. The instant cases were consolidated by Order of this Court dated June 27, 1984.↩
2. Prior to 1976, Humana Inc.'s insurance premiums were apparently considered an allowable cost for Medicare coverage.↩
3. This excerpt is from the original articles filed on August 5, 1976, rather than the restated articles filed on December 24, 1981.↩
4. While the policy entered into evidence reflects a commencement date of 8/31/77, we have accepted the stipulation of the parties that it commenced on 9/1/77.↩
5. The stipulation of the parties at one point describes this amount as $5,703,511. We agree with petitioners, however, that the record reflects that this was a computational error. At all times since 1971, Humana Inc. has owned only 62.35 percent of an entity known as Brentwood Hospital Inc. ("Brentwood"). Brentwood has never been a part of the consolidated Humana group, and respondent did not disallow amounts attributable to it herein, in the amount of $89,460. When this sum is subtracted from the total amounts paid on policy number 090176, or $5,793,031, the difference is $5,703,571. ↩
6. For reasons described in n. 5, this amount is computed as the difference between total amounts paid on policy number 090177, or $5,963,006, and the Brentwood payment, or $97,020. ↩
7. For reasons described in n. 5, this amount is computed as the difference between total amounts paid on policy number 090178, or $7,663,533, and the Brentwood payment, or $80,640. ↩
8. This amount is computed as the difference between total amounts paid on policy number 060178, or $2,878,125, and $975,000, which is the amount attributable to AMI and its subsidiaries prior to September i7, 1978, when AMI became a wholly-owned member of Humana Inc.'s consolidated group and which was not claimed by petitioners on their return for tax year ended August 31, 1979.↩
9. Effective June 1, 1979, the aggregate Coverage C coverage for policy number 090178, was increased to $13,000,000.↩
10. Among which is respondent's concession of all payments attributable to those covered subsidiaries of Humana Inc. which were other than wholly-owned by it. ↩
11. All issues relative to petitioners' tax year ending August 31, 1976, and all remaining issues relative to the other years in issue, including whether HCI must be included within the consolidated Humana group, have either been settled by the parties or will, by stipulated agreement of the parties, be determined in accordance with our disposition of the instant issue. ↩
12. All statutory references are to the Internal Revenue Code of 1954, as in effect in the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, except as otherwise noted.↩
13. The principal distinction, not present in the instant case, was that the taxpayer had no ownership interest in the so-called "captive" insurer, which was owned by four separate corporations (20 percent each), in each of which the owner of the corporate taxpayer had an interest, together with four individuals (5 percent each), who were associated in various ways with the taxpayer.↩
14. While I still adhere to the views expressed in the dissenting opinion in Clougherty, I of course accept the majority opinion in that case as the law in this Court. It should be noted that Clougherty↩ was decided after the close of the briefing schedule herein.
15. In Clougherty, we expressly reserved any opinion as to situations where the taxpayer does not completely own the subsidiary. Since we concluded in Clougherty, which involved a wholly-owned captive formed by a wholly-owned subsidiary of the taxpayer, that the taxpayer "through its wholly-owned Arizona corporation, owns all of Lombardy," it is clear that the foregoing reservation does not encompass the instant situation where HCI was owned by Humana Inc. and its wholly-owned foreign subsidiary, which was formed solely for such purpose. See also Stearns-Roger Corp., Inc. v. United States,577 F. Supp. 833, 836↩ at n. 4 (D. Colo. 1984).
16. Of the total amount of the payments in issue, or $21,055,575, petitioners contend that $3,320,753 is attributable to payments made on behalf of such individuals.↩
17. Thus, if petitioners did not get insurance coverage in return for their payments to HCI, and we hold that they did not, we cannot find that they got anything else for their money which would justify an ordinary and necessary business deduction.↩