T.C. Memo. 2010-58

UNITED STATES TAX COURT

DOUGLAS D. AND BRENDA D. CHILD, Petitioners $\underline{v}$.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 11021-06.                Filed March 25, 2010.

<u>Dale G. Siler</u> and <u>Michael C. Walch</u>, for petitioners.

<u>R. Craig Schneider</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

KROUPA, <u>Judge</u>:  Respondent determined a total of $179,443[1]

in deficiencies in petitioners' Federal income taxes and a total

---

[1]All numerical amounts are rounded to the nearest dollar.
All section references are to the Internal Revenue Code in effect
for the years at issue, and all Rule references are to the Tax
Court Rules of Practice and Procedure.

of $156,366 in fraud penalties for years 1995 through 2003 (the years at issue).  Petitioner husband (petitioner), a medical doctor, participated in a tax scheme developed and promoted by Dennis Evanson in which professional insurance premiums were paid to an offshore entity and repatriated through a home equity loan. We are asked to decide several issues.  First, we are asked to decide whether petitioners are entitled to deduct professional insurance payments and home mortgage interest payments resulting from the tax evasion scheme.[2]  We find that they are not entitled to the deductions.  We must also decide whether petitioners failed to report gross income, which we so find.  We must also decide whether petitioner's overstating deductions and underreporting income were attributable to fraud.  We hold that they were attributable to fraud.

# FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and the accompanying exhibits are incorporated by this reference.  Petitioners resided in Utah at the time they filed the petition.

---

[2]Respondent argues alternatively that petitioners are liable for the sec. 6662 accuracy-related penalties for taxable years 1995 through 2003.  Respondent concedes that petitioner wife is not liable for the sec. 6663 fraud penalties.  Respondent further concedes that petitioner wife is not liable for the sec. 6662 accuracy-related penalties if petitioner husband is found liable for the fraud penalties.  Because we find that petitioner husband is liable for the fraud penalties, petitioner wife is not liable for either the fraud or the accuracy-related penalties.

I.  Dennis Evanson's Tax Sheltering Schemes

Respondent began examining petitioners' income tax returns as part of respondent's examination of Dennis Evanson (Evanson). Evanson designed, organized, promoted and sold various schemes to help his clients shelter income from taxation.  He was ultimately convicted of Federal income tax evasion by a jury in 2008.  All of Evanson's tax evasion schemes used sham transactions to transfer clients' untaxed income to offshore entities Evanson created and controlled.  The funds were typically returned to the clients disguised as disbursements from fictitious loans to avoid taxation.  Evanson charged his clients an enrollment fee and an additional fee ranging from 10 to 30 percent of the client's tax savings, not a fixed fee.

Evanson's accountant, Brent Metcalf (Metcalf), created allocation reports listing each client's tax savings and Evanson's commission.  Metcalf also maintained the International Capital Management (ICM) account, a general ledger showing the aggregate of the client's deposits, withdrawals and transfers of funds among all the different Evanson's entities.  Metcalf was convicted of promoting a tax fraud scheme in 2008.

A.  Fraudulent Insurance Expense Method

One scheme Evanson developed and used was the fraudulent insurance expense method.  Under this method Evanson's clients would purchase fictitious insurance from an offshore company

known as Commonwealth Professional Reinsurance, Ltd. (Commonwealth), that Evanson established in Nevis, British West Indies. Evanson was also an agent for Commonwealth. The amount of the "premium" the client paid for the insurance policy was based on the amount of income the client wished to shelter from taxation. The premiums Evanson's clients paid to Commonwealth were typically higher than premiums for actual insurance purchased in the domestic market. Evanson's clients sought to further reduce or eliminate their tax liabilities by claiming the insurance premiums paid to Commonwealth as business expenses.

The funds paid by the Evanson's client were moved from the offshore bank account Commonwealth owned to an offshore bank account controlled by Medcap Management, Ltd. (Medcap), another entity Evanson created and controlled. The amount paid was also credited on the ICM account. The client could then invest the funds in other Evanson entities or could have the funds repatriated to the client through one of the various schemes Evanson designed to avoid taxation.

B. Fraudulent Mortgage Interest Deduction Method

Most of Evanson's clients had their money repatriated tax free through fraudulent loans issued by Cottonwood Financial Services, LC (Cottonwood), a Utah limited liability company Evanson established. As with Commonwealth, Evanson was the agent for Cottonwood. He determined which clients would receive the

loan distributions and in what amounts. Medcap would then "lend" the funds to Cottonwood and Metcalf would distribute the funds to the client. If a client elected to make a payment, the amount paid was credited to the offshore ICM account, not to the Cottonwood account. The loans from Cottonwood were frequently characterized as home equity loans so that the client would claim a home mortgage interest deduction on his or her personal income tax return, further reducing or eliminating his or her tax liability. The home equity loan was designed to have a high interest rate to create a larger deduction for the client.

II. Petitioners' Participation in Evanson's Tax Evasion Schemes

Petitioners were clients of Evanson during the eight years at issue. Petitioners first met Evanson at a New Year's party with some friends. Evanson's wife is the sister of petitioner wife's good friend. Petitioner was a highly compensated medical doctor specializing in radiology. He felt, however, that his compensation was relatively low compared to that of other doctors in his specialty. With Evanson's assistance petitioners entered into arrangements with Commonwealth and Cottonwood that followed the tax evasion scheme just described.

A. Petitioner's Professional Insurance With Commonwealth

Petitioner entered into a written contract with Commonwealth for professional insurance on September 30, 1994, while

petitioner was on vacation in the Cayman Islands.  Evanson acted on Commonwealth's behalf.

The Commonwealth policy provided petitioner with fictitious insurance, as provided in Evanson's tax evasion scheme. Petitioner already had various "claims made" insurance policies from insurance companies in Utah.  The alleged purpose of the Commonwealth policy was to supplement petitioner's claims made policies by providing retroactive "tail" coverage and increasing petitioner's per claim and aggregate coverage limits to $3 million and $5 million ($3/5 million claim limits), respectively. The Commonwealth policy was unnecessary, however, because all petitioner's claims made policies had a retroactive date of July 1, 1988, which was before petitioner began practicing medicine. All claims were therefore covered by petitioner's existing claims made policies.

The Commonwealth policy also did not provide petitioner with increased $3/5 million claim limits.  Instead, the policy limited Commonwealth's liability to the amount of premiums petitioner paid during the year in which the claim occurred.  These amounts ranged during the years at issue from only $30,620 to $50,846, less than one percent of the alleged $3/5 million claim limits. Moreover, the premiums petitioner paid to Commonwealth were between seven and eleven times the premiums he paid for his claims made policies, which was consistent with Evanson's tax

scheme. Commonwealth also never paid a claim against petitioner during any of the eight years at issue.

Petitioner's arrangement with Commonwealth was not well documented. There was no written contract in effect between petitioner and Commonwealth during the years at issue. Petitioner did not enter into any written contracts with Commonwealth aside from the initial agreement executed in September 1994 that expired a year later in September 1995. In contrast, all of petitioner's claims made policies were written. Petitioner also agreed telephonically to changes in the Commonwealth premium amount even though his claims made policies required all changes to be in writing. Additionally, the only record petitioner produced of the Commonwealth premium payments was an undated Quicken file he had prepared himself. Petitioner did not produce any invoices from Commonwealth. Despite the lack of substantiation, petitioners claimed a total of $282,676 of business expense deductions for insurance premiums on the Commonwealth policy for taxable years 1997 through 2003.

B. Petitioners' Home Equity Loan From Cottonwood

Petitioners also entered into a "Home Equity Line Revolving Credit Agreement" (home equity loan) with Cottonwood in furtherance of Evanson's tax scheme. Petitioners created the home equity loan on May 31, 1995, eight months after obtaining the insurance policy from Commonwealth, to repatriate the amounts

petitioner paid to Commonwealth as "premiums". Again Evanson acted on behalf of Cottonwood. Petitioners also executed a mortgage on their North Logan, Utah, residential property (the property) in favor of Cottonwood at that time, but Cottonwood did not record the mortgage.

Neither petitioners nor Cottonwood followed any of the formalities associated with a home equity loan. There were no written contracts, notes, mortgages or trust deeds between petitioners and Cottonwood other than the home equity loan agreement and the unrecorded mortgage. The Cottonwood home equity loan had a stated credit limit of $50,000, but petitioners were able to receive disbursements exceeding the credit limit without providing updated financial information or updated property appraisals because the home equity loan was based on the amount of "premiums" paid to Commonwealth. In fact, the home equity loan had an unpaid balance in November 2002 of $215,960, almost four times the stated credit limit. Cottonwood never filed a notice of default with the Cache County Recorder's Office against petitioners' property even though petitioners failed to make sufficient payments to reduce the debt. In addition, petitioners did not pay off the Cottonwood home equity loan when they sold the property.

Furthermore, petitioners did not list or disclose the Cottonwood home equity loan on a loan application with Bank of

Utah on December 19, 2002.  Petitioners failed to disclose the home equity loan even though they made an interest payment to Cottonwood approximately two months before submitting the loan application.  Petitioners also failed to list or disclose the Cottonwood home equity loan on an application to refinance the property with Market Street Mortgage Company (Market Street) in 2003.  Petitioners made several changes to the Market Street loan application but they did not include the home equity loan with Cottonwood.  Petitioners had a duty to review both the Bank of Utah and the Market Street loan applications and sign under penalty of perjury that the information provided was true.

Petitioner was credit worthy given his high-income profession.  Petitioners' residential loans with Bank of Utah and Market Street had interest rates of 5.625 and 5.375 percent, respectively.  In contrast, the Cottonwood home equity loan had a stated interest rate of 10.75 percent, which was almost twice the interest rates on petitioners' other residential loans.  Metcalf, as a representative of Cottonwood, sent annual letters to petitioner informing him of accrued interest on the home equity loan.  Petitioner could pay the accrued interest, which he occasionally did.  Petitioners were also unable to document the home mortgage interest deductions they claimed to Cottonwood. The parties have stipulated, however, that petitioners claimed a total of $49,371 of mortgage interest deductions on the

Cottonwood home equity loan for taxable years 1995 through 2000, 2002 and 2003.

C. Conclusion

We find that petitioners participated in Evanson's tax evasion schemes during the years at issue. Petitioner's conduct in sending money to the offshore account of Commonwealth or repatriating those funds to himself through advances on the home equity loan with Cottonwood followed the tax evasion scheme Evanson outlined. Petitioner's participation in the schemes was also well documented in Evanson's records. Petitioner was listed as a client on Evanson's allocation report and had amounts credited on the Evanson's offshore accounts that matched the "premium" payments made to Commonwealth. Moreover, petitioners made draws on the Cottonwood line of credit in sufficient amounts to pay the insurance "premiums" to Commonwealth.

III. Unreported Income Determined Through Bank Account Deposits

Petitioners maintained two personal bank accounts with Zions Bank in 2002 and 2003. Respondent determined petitioners' unreported adjusted gross income for taxable years 2002 and 2003 as follows:

|                                       | **2002**  | **2003**  |
| ------------------------------------- | --------- | --------- |
| Total Bank Deposits                   | $518,944  | $353,200  |
| Less: reduction for nontaxable sources | (65,407)  | (12,956)  |
| Less: income reported                 | (349,718) | (257,158) |
| Net taxable deposits:                 | 103,819   | 83,086    |
| **Unreported Adjusted Gross Income:** | **103,819** | **83,086** |

Respondent determined, based on bank account deposits, that petitioners had unreported gross income of $103,819 in 2002 and $83,086 in 2003.  Petitioner claimed that the deposits were interaccount transfers and other nontaxable deposits but produced at trial evidence of deposits that had already been factored into respondent's bank deposit analysis as nontaxable deposits. Petitioner also provided handwritten summaries and explanations of the unreported income that petitioner had prepared himself. Petitioner did not produce any admissible receipts, books, records or other documents identifying the source of the deposits.

IV.  The Deficiency Notice

Respondent issued the deficiency notice for taxable years 1995 through 2003 to petitioners on March 10, 2006.  Respondent

disallowed the deduction for professional insurance premiums
petitioner claimed he paid to Commonwealth during taxable years
1997 through 2003.  Respondent also disallowed home mortgage
interest deductions petitioners claimed on the Cottonwood home
equity loan for 1995 through 2000, 2002 and 2003.  Respondent
also determined in the deficiency notice that petitioners had
unreported gross income in 2002 and 2003 and that petitioner was
liable for the fraud penalties in the deficiency notice.
Petitioners timely filed a petition to contest the determinations
in the deficiency notice.

OPINION

We are asked to decide whether petitioners, who invested in
a tax evasion scheme, are entitled to deduct professional
insurance premium payments and home mortgage interest payments
stemming from their participation in the scheme.  We must also
decide whether petitioners failed to report gross income and
whether petitioner is liable for the fraud penalty.  We address
each of these issues in turn.

I.  Deductibility of Professional Insurance Premiums

We first address whether petitioners may deduct professional
insurance premiums paid by petitioner, a medical doctor, on the
Commonwealth policy.  We begin with general principles of tax
litigation.  Deductions are a matter of legislative grace, and
the taxpayer has the burden of proving that he or she is entitled

to the claimed deductions.  Rule 142(a); <u>INDOPCO, Inc. v. Commissioner</u>, 503 U.S. 79, 84 (1992).  Taxpayers may fully deduct all ordinary and necessary business expenses paid or incurred during the taxable year.  Sec. 162(a).  Where transactions lack a business purpose and are undertaken solely for tax avoidance purposes, however, their tax consequences will be determined based on substance and not form.  See <u>Gregory v. Helvering</u>, 293 U.S. 465 (1935).  Accordingly, all deductions stemming from a sham transaction will be disallowed.  <u>Derr v. Commissioner</u>, 77 T.C. 708, 730 (1981).

The inquiry into whether a transaction has economic substance focuses on (1) whether the transaction at issue had any practical economic consequences other than the creation of tax benefits and (2) whether the taxpayer had a valid business purpose or profit motive.  <u>ACM Pship. v. Commissioner</u>, 157 F.3d 231, 247-248 (3d Cir. 1998), affg. on this issue T.C. Memo. 1997-115.  The taxpayer bears the burden of proving that the challenged transaction was not a sham transaction lacking economic substance.  Rule 142(a); <u>Sheldon v. Commissioner</u>, 94 T.C. 738, 753 (1990).

Respondent argues that petitioners are not entitled to deduct the "premium" payments to Commonwealth because the insurance arrangement lacked economic substance.  We must first determine, therefore, whether petitioner's arrangement with

Commonwealth was a true insurance arrangement with practical economic consequences. There is no clear set of criteria for determining whether an insurance arrangement exists and this Court will consider all of the relevant facts and circumstances. Sears, Roebuck & Co. v. Commissioner, 972 F.2d 858, 864 (7th Cir. 1992), affg. in part and revg. in part 96 T.C. 61 (1991).

Historically and commonly insurance involves risk-shifting and risk-distributing. Helvering v. Le Gierse, 312 U.S. 531, 539 (1941). Shifting risk entails the transfer of the impact of a potential loss from the insured to the insurer. Clougherty Packing Co. v. Commissioner, 84 T.C. 948, 958 (1985), affd. 811 F.2d 1297 (9th Cir. 1987). If the insured has shifted its risk to the insurer, then a loss by or a claim against the insured does not affect it because the loss is offset by the proceeds of an insurance payment. Id. An insurance premium is generally the cost for shifting risk. See id.

Petitioner's arrangement with Commonwealth was not a true insurance arrangement because it did not effectively shift or distribute any risk from petitioner to Commonwealth. The policy that petitioner argues was in effect for the years at issue limited Commonwealth's liability. Unlike the asserted $3/5 million claim limits, Commonwealth's liability was limited to the amount of premiums petitioner paid during the year of the claim. Petitioner remained liable for any claims exceeding the amount of

premiums. Commonwealth never assumed the risk for claims exceeding the premium payments, nor did petitioner and Commonwealth distribute the risk to other parties. We find telling that Commonwealth never paid any claim during any of the years at issue nor for that matter was the alleged policy to cover any claims not already covered under petitioner's claims made policies. We therefore find that petitioner's arrangement with Commonwealth was not a true insurance arrangement with practical economic consequences.

We find instead that the only economic consequence of petitioner's arrangement with Commonwealth was the creation of tax benefits. Petitioner avoided taxation by transferring income disguised as "premium" payments to Commonwealth, an offshore entity. The premium payment amount was based on the amount petitioner sought to shelter from income rather than on the cost of shifting risk. Petitioner was able to further reduce his tax liability by claiming a deduction for the alleged premium payments. Moreover, the arrangement with Commonwealth followed Evanson's fraudulent insurance expense scheme, further indicating that its main purpose was to avoid taxation. We find therefore that the Commonwealth transaction was a sham transaction lacking any economic substance. Accordingly, we hold that petitioner is not entitled to deduct any "premium" payments to Commonwealth for 1997 through 2003.

II.  Deductibility of Home Equity Loan Interest Payments

We now turn to the deductibility of interest paid on the Cottonwood home equity loan.  Despite a prohibition against deducting personal interest, a taxpayer may deduct interest paid on a mortgage on real property of which he or she is the legal or equitable owner, provided it is qualified residence interest.[3] See sec. 163(h).

Respondent argues that petitioners are not entitled to deduct the payments to Cottonwood because the home equity loan arrangement was a sham.  We agree.  The Cottonwood home equity loan did not have any practical economic consequences other than tax benefits.  We find instead that the home equity loan was not a legitimate home equity loan.  First, the amount of the Cottonwood loan was never tied to the "home equity" of petitioners' property and petitioners were able to borrow in excess of the credit limit without providing updated financial information or an updated property appraisal.  Petitioners also did not pay off the loan when they sold the property, which is the quintessential antithesis of normal business practices.

---

[3]Qualified residence interest is any interest paid or accrued during the taxable year on acquisition indebtedness or home equity indebtedness.  See sec. 163(h)(3).  Home equity indebtedness is any indebtedness secured by the qualified residence of the taxpayer to the extent the aggregate amount of such indebtedness does not exceed the fair market value of the qualified residence reduced by the amount of acquisition indebtedness on the residence.  See sec. 163(h)(3)(C)(i).

Second, neither petitioners nor Cottonwood followed standard protocols with a mortgage. Cottonwood never filed a formal deed of trust or a notice of default against petitioner, and petitioners did not disclose the home equity loan on either the Bank of Utah or the Market Street loan application. Finally, the loan advances were actually repatriation of amounts petitioners paid under the fraudulent insurance expense method.

We find that the sole economic consequence of the Cottonwood arrangement was the generation of mortgage interest deductions. The interest rate on the Cottonwood home equity loan was almost double the interest rate on petitioners' other residential loans to generate a larger deduction. Furthermore, the arrangement followed Evanson's fraudulent insurance expense scheme for avoiding taxation. Accordingly, we find that the Cottonwood home equity loan lacked economic substance aside from generating tax benefits and that petitioners therefore are not entitled to deduct any "home equity loan interest" payments to Cottonwood during the years at issue.

III. Unreported Taxable Income for 2002 and 2003

We now address whether petitioner failed to report the amounts of gross income for 2002 and 2003 that respondent determined under the bank account deposits method. Gross income generally includes all income from whatever source derived. Sec. 61(a). Taxpayers must keep adequate books and records from which

their correct tax liability can be determined.  Sec. 6001.  When a taxpayer fails to keep records, the Commissioner has discretion to reconstruct the taxpayer's income by any reasonable means. Sec. 446(b); Erickson v. Commissioner, 937 F.2d 1548, 1553 (10th Cir. 1991), affg. T.C. Memo. 1989-552; Factor v. Commissioner, 281 F.2d 100, 117 (9th Cir. 1960), affg. T.C. Memo. 1958-94.

We have previously approved the use of the bank deposits method as a means of income reconstruction.  Clayton v. Commissioner, 102 T.C. 632, 645 (1994); DiLeo v. Commissioner, 96 T.C. 858, 867 (1991), affd. 959 F.2d 16 (2d Cir. 1992).  The bank deposits method assumes that all money deposited into a taxpayer's bank account during a particular period constitutes taxable income.  Clayton v. Commissioner, supra at 645.  The Commissioner must take into account, however, any known nontaxable source or deductible expense.  Id. at 645-646.  The taxpayer bears the burden of demonstrating that the Commissioner's determination is erroneous.  Mallette Bros. Constr. Co. v. United States, 695 F.2d 145, 148-149 (5th Cir. 1983); Kling v. Commissioner, T.C. Memo. 2001-78; Seidenfeld v. Commissioner, T.C. Memo. 1995-61.

Respondent determined through bank deposits analysis that petitioners failed to report taxable deposits in 2002 and 2003. Petitioners claim that the deposits were interaccount transfers or other nontaxable deposits, such as refunds and reimbursements.

In keeping with petitioners' failure to maintain adequate records to substantiate the Evanson's transactions, petitioners did not produce the receipts or otherwise present any books, records, or other testimony that would support this assertion. The only evidence petitioner presented identifying the deposits at issue was documents that petitioner prepared himself.[4] Petitioners produced no corroborating evidence other than petitioner's own self-serving testimony, which we are not required to accept, and which we do not, in fact, find to be credible. See Niedringhaus v. Commissioner, 99 T.C. 202, 219 (1992). We therefore find that petitioners have failed to meet their burden, and we sustain respondent's determination that petitioners failed to report income in the amounts respondent determined for 2002 and 2003.

IV.  Section 6663 Fraud Penalty

We next consider whether petitioner is liable for the section 6663 fraud penalties. Fraud is an intentional wrongdoing on the part of the taxpayer with the specific purpose of evading a tax believed to be owing. Edelson v. Commissioner, 829 F.2d 828, 833 (9th Cir. 1987), affg. T.C. Memo. 1986-223; Akland v. Commissioner, 767 F.2d 618, 621 (9th Cir. 1985), affg. T.C. Memo. 1983-249. A penalty equal to 75 percent of the underpayment will be imposed if any part of the taxpayer's underpayment of Federal

---

[4]Petitioner produced at trial evidence that had already been factored into respondent's bank deposit analysis as nontaxable deposits.

income tax is due to fraud. See sec. 6663(a). Further, if any portion of the underpayment is attributable to fraud, the entire underpayment will be treated as attributable to fraud unless the taxpayer establishes by a preponderance of the evidence that part of the underpayment is not due to fraud. Sec. 6663(b).

Respondent has the burden of proving by clear and convincing evidence that an underpayment exists for each of the years in issue and that some portion of the underpayment is due to fraud. See sec. 7454(a); Rule 142(b). Fraud is never presumed but must be established by independent evidence that establishes fraudulent intent. Edelson v. Commissioner, supra at 832; Beaver v. Commissioner, 55 T.C. 85, 92 (1970). Courts have developed several indicia, or "badges of fraud," from which fraudulent intent can be inferred. They include: (1) understating income; (2) maintaining inadequate records; (3) engaging in a pattern of behavior that indicates an intent to mislead; (4) concealing assets; (5) providing implausible or inconsistent explanations of behavior; (6) filing false documents; and (7) failing to provide documents to the Commissioner during examination. Bradford v. Commissioner, 796 F.2d 303, 307 (9th Cir. 1986), affg. T.C. Memo. 1984-601; Cooley v. Commissioner, T.C. Memo. 2004-49. Although no single factor is necessarily sufficient to establish fraud, a combination of several of these factors may be persuasive evidence of fraud. Bradford v. Commissioner, supra at 307-308;

Solomon v. Commissioner, 732 F.2d 1459, 1461 (6th Cir. 1984), affg. per curiam T.C. Memo. 1982-603; Niedringhaus v. Commissioner, supra at 211.

We now apply these criteria to petitioner's situation to determine whether there are any badges of fraud. First, petitioner's nonreporting of income and claiming of sham deductions resulted in an underpayment for each of the years at issue. We find petitioner's nonreporting of income and overstating deductions to be indicia of fraud.

Additionally, petitioner failed to maintain adequate records to substantiate the income as well as the deductions. Petitioner failed to produce documents to substantiate the taxable deposits at issue. He also failed to produce all insurance policies that were in effect during the years at issue, including claims made policies, despite respondent's issuance of a subpoena. Petitioner argues that the Commonwealth policy was unwritten and could be modified orally in contrast to his claims made policies, which required changes to be in writing. We find it hard to believe that petitioner would have relied on an unwritten policy with Commonwealth particularly given the substantial amounts of the "premium" payments. Equally telling is the lack of records for the inflated home equity loan arrangement. Petitioner brazenly claimed "interest" deductions on a home equity loan that

had exceeded the $50,000 credit limit.  We find petitioner's failure to maintain adequate records to be an indicium of fraud.

The sham transactions petitioner participated in were designed by Evanson to mislead the Internal Revenue Service (IRS) into treating otherwise taxable income as nontaxable.  In fact, Evanson was convicted of tax evasion for organizing and promoting the transactions.  As part of Evanson's tax evasion schemes, petitioner made payments disguised as insurance premiums to an offshore entity.  The funds were returned to him disguised as loan advances to avoid taxation.  Petitioner further reduced or eliminated his taxable income by claiming sham deductions from the transactions.  The tax evasion schemes also enabled petitioner to conceal income.  Petitioner had amounts credited on Medcap's offshore accounts that matched the "premium" payments he had made to Commonwealth.  We find that petitioner participated in Evanson's schemes to mislead the IRS and conceal assets and that his participation is an indicium of fraud.

Petitioner also provided implausible explanations of his behavior in an attempt to conceal the fraudulent nature of the Evanson's transactions.  For example, petitioner claimed that the Commonwealth policy provided supplemental insurance even though the policy was unwritten and failed to provide coverage beyond his existing claims made coverage.  Petitioner was unable to explain how he could receive loan advances on the Cottonwood home

equity arrangement in excess of the credit limit without providing updated financial information and without Cottonwood's filing a notice of default.  We find petitioner's implausible explanations to be indicia of fraud.

Petitioner filed false documents when he failed to report the Cottonwood home equity loan on loan applications submitted to Bank of Utah and Market Street in 2002 and 2003, respectively. Petitioner claims that his failures to disclose the Cottonwood home equity loan on both documents were inadvertent oversights and that someone else prepared the paperwork.  He asks us to ignore his obligation to verify the accuracy of the documents before he signed them under penalties of perjury.  We are not disposed to turn a blind eye to such oversights, especially when a tax scheme is being used to inflate deductions and deflate income.  We find petitioner's failure to disclose the Cottonwood home equity loan to be an indicium of fraud.

Finally, petitioner did not respond to a subpoena issued by respondent.  We find petitioner's failure to cooperate with respondent to be a further indicium of fraud.

Most of the badges of fraud upon which this Court customarily relies are present in this case.  Respondent has also established that petitioner received unreported income and claimed false deductions and that the nondisclosure of the income and the claiming of sham deductions resulted in an underpayment

for each of the years at issue.  Considering all the facts and circumstances, we find that respondent has proven by clear and convincing evidence that petitioner fraudulently intended to evade taxes.  Accordingly, petitioner is liable for the section 6663 fraud penalties for the years at issue.

Because of our holding regarding the fraud penalties under section 6663, we need not address whether petitioner is liable for the accuracy-related penalties under section 6662.

We have considered all other arguments in rendering our decision and to the extent they are not mentioned, we find them to be irrelevant, moot or meritless.

To reflect respondent's concessions,

An appropriate decision

will be entered.